# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## BRYSON CITY DIVISION
## CRIMINAL CASE NO. 2:14-cr-00021-MR

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Appellee,** | ) | |
| | ) | |
| | ) | |
| **vs.** | ) | **MEMORANDUM** |
| | ) | **OF DECISION** |
| | ) | |
| **DAVID FRANK CRISP,** | ) | |
| | ) | |
| **Appellant.** | ) | |
| _____ | ) | |

**THIS MATTER** is on appeal to the Court from the Magistrate Judge
based upon the Notice of Appeal [Doc. 2] filed by Appellant David Frank
Crisp (herein "Defendant").

## PROCEDURAL BACKGROUND

The United States Attorney named the Defendant, together with his
son David Chadwick Crisp ("Chad Crisp"), in a Bill of Information. [Doc. 1].
The U.S. Attorney charged the Defendants in Count Seven with the petty
offense of placing processed food products as bait in an area that had an
open season for taking black bears, and aiding and abetting one another.
The verbatim charge states:

<u>COUNT SEVEN</u>

On or about August 31, 2011, in the special territorial jurisdiction of the United States, that is, the Nantahala National Forest, in Graham County, within the Western District of North Carolina, and elsewhere, the defendants,

DAVID CHADWICK CRISP,
and
DAVID FRANK CRISP,

did knowingly and intentionally place processed food products as bait in an area with an open season for taking black bears, and did aid and abet one another in the commission of such offense, in violation of North Carolina General Statute § 113-291.1(b)(2) and § 113-294(r), and 15A North Carolina Administrative Code 10D.0103(d).

All in violation of 36 C.F.R. Section 261.8(a), and 18 U.S.C. Section 2, a petty offense.

[<u>Id.</u> at 4]. [1]

The Defendant proceeded to trial before the Magistrate Judge on October 7, 2014. Following the close of the Government's case, the Defendant moved for acquittal on Count Seven arguing that the Government failed to prove two essential elements of the offense beyond a reasonable doubt: (1) that Graham County had an open bear season in 2011 [Doc. 9-2

---

[1] The U.S. Attorney also charged the Defendant in Count Eighteen with the petty offense of aiding and abetting Chad Crisp in the gathering, removing, digging, disturbing, and possessing of ginseng in and from the Great Smoky Mountains National Park in violation of state and federal law. [Doc. 1 at 9]. The Magistrate Judge acquitted the Defendant of that charge. [Doc. 9-2 at 170].

at 48-52; 76]; and (2) that the Defendant was engaged in any activity prohibited under 36 C.F.R. Section 261.8(a). [Doc. 9-2 at 46; 53]. Regarding the Defendant's first argument, the Government conceded that it did not offer proof that Graham County had an open bear season in 2011 but argued that the Magistrate Judge could take judicial notice of this "legislative fact." [Id. at 60]. Alternatively, the Government argued that it would be permissible for the Magistrate Judge to allow it to reopen its case to offer evidence of this fact. [Id. at 74]. The Magistrate Judge consulted the North Carolina Wildlife Resources Commission's hunting regulations effective August 1, 2011[2], and determined Graham County had an open bear season in 2011. [Id. at 61-63]. He then concluded, "I think this is something I could take judicial notice of[.]" [Id. at 76]. Out of an abundance of caution, however, the Magistrate Judge, over the Defendant's objection, also allowed the Government to reopen its case to put on this evidence. [Id.].

Regarding the Defendant's second argument, the Government asserted that ample evidence existed to convict the Defendant of violating 36 C.F.R. Section 261.8(a) on the basis that he both "hunted" and "molested"

---

[2] 15A N.C. Admin. Code § 10B.0202 (effective Aug. 1, 2011, to July 31, 2012), which Magistrate Judge examined, stated: "(a) Open Seasons for bear shall be from the: (1) Monday on or nearest October 15 to the Saturday before Thanksgiving and the third Monday after Thanksgiving to January 1 in and west of the boundary formed by I-77 from the Virginia State line to the intersection with I-40, continuing along I-40 west until the intersection of NC 18 and NC 18 to the South Carolina State line." [Doc. 9-2 at 61-62].

bears.  [Doc. 9-2 at 70; 92; 155].  The Magistrate Judge denied the

Defendant's motion for acquittal, concluding that:

> THE COURT: All right. I'm going to deny the Rule 29
> motion. I think the evidence fits within the 36 CFR regulation
> which reads: "The following are prohibited to the extent federal
> or state law is violated. (a) Hunting, trapping, fishing, catching,
> molesting, killing, or having in possession any kind of wild
> animal." The evidence here is that the processed food, candy --
> chocolate -- was placed as bait in Graham County, which is an
> area of the state where the Wildlife Resources Commission has
> set an open season for the taking of Black Bear. And the purpose
> of that was to either hunt, trap, catch, kill, or have in possession
> or molest the bear by getting them, the bear, being no longer
> used to eating their natural foods. They know there's a steady
> source of food for them to get at the -- where the bear -- the bait
> was placed.

[Doc. 9-2 at 93-94].

Ultimately, the Defendant was convicted of the charge alleged in Count

Seven on October 9, 2014. [Doc. 9-2 at 170]. Magistrate Judge Howell

sentenced the Defendant to 90 days imprisonment and a $2,000 fine.  [Doc.

1-1].  The Magistrate Judge entered his Judgment on October 15, 2014.  [Id.].

The Defendant timely filed his Notice of Appeal that same day.  [Doc. 2].

## FACTUAL BACKGROUND

David Webb, an officer with the law enforcement division of the

Georgia Department of Natural Resources, testified that he was assigned to

act in an undercover capacity for the joint federal/state investigation known

as "Operation Something Bruin."  [Doc. 9-1 at 17].  Brian Southard, a criminal

investigator with the United States Forest Service, was the Forest Service's case agent for Operation Something Bruin and worked with Webb in this matter. [Id. at 168-70]. According to Southard, Operation Something Bruin was a multi-agency investigation into "various crimes related to illegal bear hunting, such as illegal outfitter, guiding, the sale and possession of bear parts, the illegal baiting of bears, those sorts of things." [Id. at 169].

In furtherance of their investigation, Webb and Southard traveled to Bryson City, North Carolina, in 2010 and visited sporting goods stores to inquire who in the area might be able to take them bear hunting. [Id. at 57-59]. The name they received was one Chad Crisp and the men were provided a telephone number and information that Chad Crisp could be found at the Panther Creek boat dock on Fontana Lake. [Id. at 59]. Webb and Southard traveled to the boat dock in July of 2010 and met the Defendant and Chad Crisp there. [Id.]. Webb told the Crisps that his name was David Williams, that he had moved up from Blairsville, Georgia, that he was in the lawn care business, and that he "was looking to go bear hunting[.]" [Id. at 60]. Webb engaged in various activities with Chad Crisp thereafter in 2010. [Id. at 63]. In response to being asked what kind of activities, Webb testified, "Hunting. And visits to – well, between that time, hunting and visits

to bring dog food and purchase dogs and different things like that." [Id. at 18].

In August of 2011, Webb continued his hunting activities with Chad Crisp. [Id. at 63]. On August 25, 2011, Webb traveled to Chad Crisp's home to bring him some dog food. [Id. at 18]. While at the home, Chad Crisp showed Webb a 55-gallon drum but Webb did not look inside the drum on that visit to see what it contained. [Id. at 19]. On August 31, 2011, Webb returned to Chad Crisp's home in order "to put out bait … [o]n the lake." [Id. at 19-20]. Chad Crisp showed Webb the same drum, which according to Webb's testimony, "looked like M&Ms, a combination of M&Ms and chocolate waste." [Id. at 20]. Webb shoveled some of the chocolate waste from the drum into a 5-gallon bucket filling it. Webb then placed the bucket in the back of his truck and he and Chad Crisp drove down to the boat dock located behind Chad Crisp's home. [Id. at 22]. Webb took the bucket from his truck and carried it to the boat dock where he set it down. [Id.]. The Defendant then arrived at the dock with his dog, "Cowboy." As the Defendant and his dog walked past the bucket filled with chocolate waste, the Defendant said, "There's you some bear bait, Cowboy." [Id. at 22-23].

Webb and Chad Crisp put the bucket in a 20 to 24 foot pontoon boat [Id. at 33] and then the three men traveled across a portion of Fontana Lake

in the boat piloted by the Defendant.  [Id. at 23].   The Defendant beached

the boat in a cove and then Chad Crisp and Webb got out of the boat, Webb

carrying the bucket of chocolate waste with him.  [Id. at 24].  On land, Webb

followed Chad Crisp, who was walking parallel with the shoreline of the lake,

approximately 50 yards toward the head of the cove.   The men then

ascended into the tree line where Chad Crisp showed Webb a black, 55-

gallon drum bolted to a tree.  [Id. at 26-27].   Next to the drum was a wooden

barrel top and a wire frame, "like a fan frame cover," lying on the ground with

an orange cord, similar to a string-trimmer cord, tied to the fan frame.  [Id. at

27].   Webb and Chad Crisp emptied the 5-gallon bucket of chocolate waste

into the drum attached to the tree.  [Id.].   Then, according to Webb,

> The wire frame, fan frame, was put on top of the drum, and the
> other end of the weed eater cord was attached to a magnet and
> a dog collar which was secured to a tree, a small tree. And Chad
> Crisp had told me to, you know, knock the fan cover off.

[Id.].  When Webb knocked the fan frame off of the barrel, the cord tied to

the frame pulled the magnet out of the dog collar.  [Id. at 32].   Following this

series of events, Webb reassembled the barrel components as before and

then he and Chad Crisp walked back to the boat.  [Id.].

The Defendant was still at the boat when the two men returned.  [Id.].

Webb and Chad Crisp boarded the boat and the Defendant began piloting

the boat back to the dock.  [Id. at 33].  Along the way, the Defendant's boat

passed by another boat carrying a person whose first named was Owen. [Id.].  Owen asked Chad Crisp if he had put out any bear bait and Chad Crisp responded that the barrel "was empty and we reloaded it."  [Id. at 39]. Following this short conversation, Webb, Chad Crisp, and the Defendant returned to the dock in the pontoon boat and that ended Webb's involvement with the Defendant and Chad Crisp that day.  [Id.].

On the evening of September 7, 2011, Chad Arnold, an investigator with the North Carolina Wildlife Resources Commission, rode with Webb to Chad Crisp's home.  [Id. at 95; 119].  Like Webb, Arnold's participation in Operation Something Bruin was that of a covert agent portraying a citizen interested in hunting activities.  [Id. at 95].  Webb and Arnold went to Chad Crisp's home that night to participate in a bear hunt.  [Id. at 96].  Chad Crisp piloted a boat from his boat dock and transported the group to the cove where he and Webb were taken previously by the Defendant on August 31, 2011, to "reload" the bait barrel.  [Id.].  The Defendant, however, was not present and did not participate in any of the activities on the evening September 7, 2011.  [Id. at 118].  Before beaching the boat in the cove, the men "were sitting on the water listening for the dog collar to go off.  Over a period of time, the tracking device went off indicating that there was activity at the bait barrel."  [Id. at 96].  Upon learning that the tracking device had

been tripped by someone or something removing the fan frame from the bait barrel, the men beached the boat and proceeded to the bait barrel. [Id. at 97]. There, the men found a black bear up the tree to which the bait barrel was bolted. [Id.]. The treed bear was killed that evening by Chad Crisp under grossly inhumane circumstances.[3] [Id. at 125].

As its last witness, the Government called Trey Harter, a land surveyor with the U.S. Forest Service. [Id. at 197]. The Magistrate Judge, without objection, qualified Harter to testify as an expert witness in the field of Forest Service surveying. [Doc. 9-2 at 5]. Ultimately, Harter opined that the tree to which the bait barrel was attached is located upon lands that are within the ownership and control of the United States Forest Service. [Id. at 39-40].

## STANDARD OF REVIEW

The Court has jurisdiction for this appeal pursuant to 18 U.S.C. § 3402, and the scope of the appeal is the same as the review of a district court's judgment by a court of appeals. Fed.R.Crim.P. 58(g)(2)(D).

---

[3] Finding the bear in the tree with the bait, Chad Crisp shot it twice, once in the leg and once in the shoulder. It then fell from the tree and "rolled and continued to roll down towards the lake. Mr. Crisp then took out a box cutter from his pocket and started stabbing the bear in the head. He then took a stick and started poking it in its wound, and it was screaming and yelling. The bear then continued to roll down to the lake. It was definitely suffering, and at that point Mr. - - R.F.C. Webb said I've got a pistol in my backpack. Chad Crisp took the pistol and shot the bear in the head while it was in the lake." [Doc. 9-1 at 125-26].

**DISCUSSION**

On appeal, the Defendant raises four issues in this Court. Two issues, he claims, relate to the sufficiency of the evidence supporting the Defendant's conviction, the third issue concerns the admissibility of certain evidence, and the final issue is one already resolved by the Supreme Court which the Defendant raises to preserve in an effort to persuade the Supreme Court to reconsider its prior holding.

I.    Sufficiency of the Evidence of Open Bear Season.

The Defendant contends, in his first argument, that the Government, prior to resting, "fail[ed] to put on any evidence that there was an open bear season in Graham County in 2011." [Doc. 9 at 4]. Further, the Defendant argues that the Magistrate Judge committed reversible error by allowing the Government to reopen its case, after his Rule 29 motion for acquittal, to introduce evidence establishing the alleged missing fact. [Id. at 5]. In response, the Government asserts that it was proper for the Magistrate Judge to allow it to reopen its case to establish if Graham County had an open bear season in 2011. [Doc. 10 at 9]. Alternatively, the Government argues that the Magistrate Judge could take judicial notice of the "legislative fact" that Graham County indeed had an open bear season in 2011. [Id. at

11].  The Court concludes that Magistrate Judge Howell committed no error with regard to this issue.

To put the Defendant's argument on this issue into perspective for its analysis, the Court must examine first how the statutes cited in the Information interact, and second the manner in which a court could take judicial notice of the "open season" fact at issue.

As set forth above, Count Seven alleged that the Defendants placed processed food products as bait in an area with an open season for taking black bears, and aided and abetted each other, all in violation of North Carolina General Statute §§ 113-291.1(b)(2) and 113-294(r), 15A North Carolina Administrative Code § 10D.0103(d), and 36 C.F.R. § 261.8(a). Under the federal regulation, 36 C.F.R. § 261.8(a), it is a petty offense, to the extent any state or federal law is violated, for any person while on U.S. Forest Service lands to hunt, trap, fish, catch, molest, kill, or possess any kind of wild animal, bird, or fish, or take the eggs of any such bird.  The elements of 36 C.F.R. § 261.8(a) make it unlawful for any person to: (1) on U.S. Forest Service lands (2) hunt, or trap, or fish, or catch, or molest, or kill, or possess any kind of wild animal, or bird, or fish, or take the eggs of any such bird (3) if such action would violate any state or federal law. Since the manner or means components enumerated in element (2) are written in the

disjunctive, the regulation may be violated in numerous distinct ways. The facts adduced at trial, taken in the light most favorable to the Government, tend to show that the Defendant's role in the offense was that of an aider and abetter. 18 U.S.C. § 2. The Court therefore turns to North Carolina substantive law to examine what state law the Defendant may have aided and abetted Chad Crisp in violating.

The 2011 version[4] of North Carolina General Statute section 113-294(r) made it unlawful to:

> place processed food products as bait in any area of the State where the Wildlife Resources Commission has set an open season *for taking* black bears. For purposes of this subsection, the term "processed food products" means any food substance or flavoring that has been modified from its raw components by the addition of ingredients or by treatment to modify its chemical composition or form or to enhance its aroma or taste. The term includes substances modified by sugar, honey, syrups, oils, salts, spices, peanut butter, grease, meat, bones, or blood, as well as extracts of such substances. The term also includes sugary products such as candies, pastries, gums, and sugar blocks, as well as extracts of such products. Nothing in this subsection prohibits the lawful disposal of solid waste or the legitimate feeding of domestic animals, live-stock, or birds. The prohibition against taking bears with the use and aid of bait shall not apply to the release of dogs in the vicinity of any food source that is not a processed food product as defined herein.

---

[4] All citations herein to North Carolina law reference the provisions in effect on August 31, 2011, the date of the Defendant's offense.

N.C. Gen. Stat. § 113-294(r) (2011) (emphasis added).[5] "To take" game is defined quite expansively in North Carolina and means "[a]ll operations during, immediately preparatory, and immediately subsequent to an attempt, whether successful or not, to capture, kill, pursue, hunt, or otherwise harm or reduce to possession any fisheries resources or wildlife resources." N.C. Gen. Stat. § 113-130(7) (2011).

Harmonizing the proof necessary to obtain a conviction under these statutes yields the Government's theory of prosecution that it pursued in trying the Defendant: by dumping approximately five gallons of chocolate waste into the barrel with a cover rigged with a transmitter and attached to the tree on Forest Service lands in Graham County, Chad Crisp was illegally placing processed food products as bear bait. Further, because the Wildlife Resources Commission had set an open season for taking black bears in that "area," Chad Crisp was prohibited from baiting bears there. Also, Chad Crisp's conduct of bear baiting in this manner could be either "hunting," since taking bear under state law includes all operations immediately preparatory

_____

[5] Section 10D.0103(d) of Title 15A of the North Carolina Administrative Code is the unprocessed food product regulatory embodiment of the anti-baiting statute applicable only to bears. In pertinent part, the 2011 version of the regulation stated: "No person shall place, or cause to be placed on any game land, salt, grain, fruit, or other foods without prior written authorization of the commission or its agent. A decision to grant or deny authorization shall be made based on the best management practices for the wildlife species in question. No person shall take or attempt to take any game birds or game animals attracted to such foods." 15A N.C. Admin. Code § 10D.0103(d) (2011).

to the successful capture and killing of a black bear (that occurred one week later), or "molesting," since the placement of processed food products lures bears from their natural habitat and interferes with their ingestion of a normal diet. Finally, the Defendant aided and abetted Chad Crisp by chauffeuring him by boat to and from the bait site knowing that Chad Crisp was going to "reload" the barrel with a substance the Defendant had acknowledged he knew to be bear bait.

The primary question thus raised by the Defendant concerns the procedure by which element (3) of this criminal offense may be proven: may the Court take judicial notice of whether Graham County had an open bear season in 2011 in order to establish that element? If so, a secondary question arises as to whether the Magistrate Judge followed the proper procedure in noticing the fact. If the answer to either of the preceding questions is no, then an alternative question arises as to whether the Magistrate Judge erred in permitting the Government to reopen its case and establish the fact by competent evidence.

The Government argues that the evidentiary rule pertaining to judicial notice, Rule 201, is inapplicable in this case. Federal Rule of Evidence 201, by its very terms, "governs judicial notice of an adjudicative fact only, not a legislative fact." Fed.R.Evid. 201(a). Because determining whether Graham

County has an open bear season is easily accomplished by resorting to the North Carolina wildlife regulations (as the Magistrate Judge did in this matter), the Government argues this fact is necessarily legislative and not adjudicative, citing United States v. Lavender, 602 F.2d 639, 641 (4th Cir. 1979) (judicially noticing that Blue Ridge Parkway was within the special maritime and territorial jurisdiction of the United States).

The Defendant's objection to the Magistrate Judge taking judicial notice was not substantive; it was procedural:

> The government had their opportunity and it's just it's a simple thing to do. They could have put on one of the elements that there was an open bear season. And my point is this. He could have asked you to take judicial notice of that at any time until he rested.

[Doc. 9-2 at 75]. If the fact of Graham County's open season is legislative, then the procedure of Rule 201(d) is inapplicable and the Defendant's objection must be overruled. But even if the fact were adjudicative the objection would still have to be overruled. The Magistrate Judge sufficiently complied with the procedural requirements of Rule 201(d). That rule permits a court to take judicial notice in a criminal matter "at any stage of the proceeding" prior to the jury receiving the case. Judicial notice was taken at the end of the Government's case and clearly before the trial was over. The Magistrate Judge was both the presiding judicial officer and the finder of fact.

No jury instruction dictated by Rule 201(f) was required.  The Magistrate Judge took such notice before acting to decide the case.  As such, his act of taking judicial notice was timely and in accordance with Rule 201.

In sum, under the circumstances of this case, the Magistrate Judge was correct to take judicial notice of Graham County having an open bear season in 2011 given that he had the authority to do so <u>sua</u> <u>sponte</u>, and given the uncontested information available to him about this fact. The Defendant had the opportunity to be heard, and was heard, about the propriety of the Magistrate Judge noticing this fact. The Defendant did not contest the accuracy of the information Magistrate Judge Howell consulted in his determination of Graham County's 2011 bear season. The Court, therefore, concludes that the Government met its burden of proof as to this element of the offense charged in Count Seven of the Information. Accordingly, the Court need not address the Defendant's argument that the Magistrate Judge erred in permitting the Government to reopen its case to establish this fact.  The Defendant's first argument, therefore, is overruled.

II.    <u>Sufficiency of the Evidence of a Violation of 36 C.F.R. § 261.8(a)</u>.

Count Seven of the Information alleges that the Defendants placed processed food products as bait in an area with an open season for taking black bears and aided and abetted each other in doing so.    The

Government's primary argument is that the Defendants placed the bait in preparation for, and to further, their bear hunting activities.[6] The Defendant asserts that the Government charged the Defendant with a violation of 36 C.F.R. § 261.8(a) but "[t]here was not a scintilla of evidence presented by the Government that the Defendant engaged in any of the … activities" prohibited by that regulation. [Doc. 9 at 9]. As it pertains to hunting, the Defendant contends "[t]here is absolutely no evidence that the Defendant David Frank Crisp engaged in any pursuit, or search for animals for the purpose of or means of capturing or killing them at the time of the alleged State violation." [Id.]. The Defendant was charged with aiding and abetting the hunting of black bears by means of baiting, in violation of 18 U.S.C. §2, 36 C.F.R. §261.8(a), and N.C. Gen. Stat. §113-294(r). Defendant's argument is grounded on a very narrow definition of hunting (and ignores Defendant's aiding and abetting).

As set forth above and as cited by the Defendant in his brief, hunting under North Carolina law is defined quite expansively. To "hunt" is defined as "[t]o take wild animals or wild birds." N.C. Gen. Stat. § 113-130(5a). "To take," in turn, is defined in North Carolina as "[a]ll operations during,

---

[6] The Government's secondary argument is that the Defendants placed the bait to "molest" the bears. Given its resolution of this part of the Defendant's appeal, the Court need not address the Government's secondary "molestation" argument.

immediately preparatory, and immediately subsequent to an attempt, whether successful or not, to capture, kill, pursue, hunt, or otherwise harm or reduce to possession any fisheries resources or wildlife resources." Id. (7).

In this matter, there is no question that Chad Crisp was engaged in hunting, as defined by North Carolina law, on August 31, 2011. Such hunting was unlawful because it was done with the aid of bait. Taking wildlife in North Carolina includes all of a hunter's acts while undertaking to kill wildlife, but also includes those acts *in preparation for* such undertaking. The Defendant knowingly aided and abetted in such preparation. The Defendant asserts that the statute requires the Defendant's actions be "*immediately* preparatory" and that Chad Crisp's killing of a bear eight days later at the bait site fell outside the timeframe of what could be considered "immediate" as that term is defined in Black's Law Dictionary. [Doc. 9 at 10]. Defendant's reliance on Black's Law Dictionary is misplaced. The word "immediate" must be placed in the context of the activities giving rise to the violation. The gravamen of the baiting offense is the hunter's ability to obtain an unfair advantage over his prey by luring it to a specific location using attractive foodstuffs not otherwise available in the wild. The bait, in this case chocolate waste, would appeal first to a bear's sense of smell which would draw it to

the barrel to feed. How quickly or "immediately" a bear might be lured to the bait barrel would depend upon several factors, for example wind speed, wind direction, the proximity of bears, and the speed with which bears travel in search of food. The Defendant and Chad Crisp clearly understood that, upon the filling of the bait barrel, bears would not arrive in an "instant" or "without delay" as the Defendant urges the Court to adopt as the standard for "immediate." To be sure, the Defendants knew the bait would take some time to have the intended effect. It is for this reason that Chad Crisp rigged the cover of the bait barrel to transmit a radio a signal when the cover was disturbed. He sought to obviate his need to wait near the barrel for days before a bear would arrive.

The Defendant was convicted of aiding and abetting Chad Crisp's hunting because Defendant piloted the boat carrying Chad Crisp to and from the bait site knowing that Chad Crisp was going to "reload" the barrel with a substance the Defendant had stated he knew to be bear bait. All of the Defendant's conduct in this regard encompassed hunting[7] under North

_____

[7] The Defendant never raised the argument that Count Seven failed to allege an essential element of the offense, that is, the specific unlawful state-defined activity, ("hunt, or trap, … or catch, or molest," etc.) for which the baiting was preparatory. The violation of any state or federal law must necessarily be keyed to a specific alleged activity pursued under the regulation. United States v. Patzer, 15 F.3d 934, 939 (10th Cir. 1993) (section 261.8(a), means that *hunting* is prohibited to the extent a federal or state *hunting* law is violated). The Defendant has waived this issue. Had the Defendant raised the issue for

Carolina law as such conduct was activity geared toward luring bears to the bait site to be killed. As such, it clearly satisfied the statutory requirement of any "operations … immediately preparatory … to an attempt, whether successful or not … to capture, kill, pursue, hunt, or otherwise harm or reduce to possession any … wildlife resources." The Defendant's second argument is therefore overruled.

III. <u>The Admissibility of Certain Evidence</u>.

The Defendant contends, in his third argument, the Magistrate Judge erred in admitting two hearsay statements: "(1) one made by Chad Crisp to a third-party named Owen and Owen's response made during the trip back to the dock; and (2) one allegedly made by the Defendant David Frank Crisp and heard by Officer Webb." [Doc. 9 at 12].

---

the first time on appeal to this Court, however, a post-verdict challenge to the sufficiency of a charging document imposes a substantial burden upon a defendant. "When a post-verdict challenge to the sufficiency of an indictment is made, every intendment is then indulged in support of sufficiency. The question then is only whether the necessary facts appear in any form, or by a fair construction can be found within its terms. Where the post-verdict challenge to the indictment relates to the absence of an element, the indictment will be held sufficient if it contains words of similar import." <u>United States v. Vogt</u>, 910 F.2d 1184, 1201 (4th Cir. 1990) (internal citations and quotations omitted). The Information contains "words of similar import" to hunting. All of the other counts contained within the Information that alleged a violation of § 261.8(a) state "hunting" as the activity pursued. <u>See</u>, Information, Counts Four through Six; Counts Eight through Seventeen. [Doc. 1 at 2-8]. Further, "a fair construction" of Count Seven put the Defendant on notice that he was aiding and abetting Chad Crisp's illegal hunting as that Count stated the placing of bait was in an area with an open season "for taking bears." [<u>Id.</u> at 4].

During Defendant's trial, Webb testified that when he, Chad Crisp, and the Defendant were on their return voyage from filling the bait barrel, their boat crossed paths with an individual known to Chad Crisp as "Owen." [Doc. 9-1 at 34 to 38].  Webb testified as follows:

> Q. Did Owen ask Chad anything?
> A. He asked if we put any bait -- bear bait out.
> Q. What, if anything, did Chad reply?
> A. He said that it was empty and we reloaded it.
> Q. Okay. After the conversation with this Owen fellow ended, did you-all get back to the dock?
> A. Yes.

[Id. at 38 to 39].  Defendant objected to this testimony arguing, "[i]t is straight up hearsay, Your Honor."  [Id. at 35].  Magistrate Judge Howell allowed the admission of this testimony into evidence as a present sense impression under Rule 803(1) of the Federal Rules of Evidence.  [Id. at 38].

Hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed.R.Evid. 801(c). In order to determine whether an out-of-court statement qualifies as inadmissible hearsay under this Rule, the trial court must "identify [ ] the actual purpose for which a party is introducing" the statement at issue. United States v. Gonzales–Flores, 701 F.3d 112, 117 (4th Cir. 2012). A statement is not hearsay if it is offered for some purpose other than to prove

21

the truth of the assertion contained within the statement. <u>United States v.</u> <u>Pratt</u>, 239 F.3d 640, 644 (4th Cir. 2001).

In this case, the Government did not offer this testimony as proof that Webb and Chad Crisp had, in fact, refilled the bait barrel with chocolate waste; Webb had previously testified to that fact based upon his own participation and first-hand knowledge. As the Government pointed out, the purpose of introducing this testimony was to show that the Defendant had been informed that the bear bait had been placed (i.e. for notice), and based on the Defendant's failure to react in an alarmed, antagonistic, or any other manner, the finder of fact could infer the Defendant was a knowledgeable and willing participant in Chad Crisp's illegal baiting endeavor. For this reason Webb's testimony was not offered for a hearsay purpose. While the Magistrate Judge admitted this testimony on a different basis, such admission was not erroneous.

The Defendant's second argument concerning what he contends to be inadmissible hearsay surrounds a statement Webb testified the Defendant made at the boat dock before the men traveled to refill the bait barrel. After filling a 5-gallon bucket with chocolate waste at Chad Crisp's house, Webb put the bucket in the back of his truck and he and Chad Crisp drove down to the boat dock located behind Chad Crisp's home. [Doc. 9-1 at 22]. Webb

took the bucket from his truck and carried it to the boat dock where he set it down.  [Id.].  The Defendant then arrived at the dock with his dog, "Cowboy." As the Defendant and his dog walked past the bucket filled with chocolate waste, Webb testified that the Defendant said, "There's you some bear bait, Cowboy." [Id. at 22-23]. At trial, the Defendant objected to the admission of this testimony.

The Defendant objects to this testimony on appeal because it was uncorroborated.[8]  [Doc. 9 at 15].  At the time Defendant made this statement, Webb was carrying covert audio equipment on his person and it failed to record the Defendant's statement.  [Doc. 9 at 15].  During Defendant's cross-examination of Webb, the Defendant asked Webb to play that portion of the Government's soundtrack that allegedly recorded what was said on the Defendant's boat dock prior to the men departing in the Defendant's pontoon boat.  [Doc. 9-1 at 91].  After playing the appropriate audio clip, Webb conceded that the statement he testified the Defendant made in his presence about the bucket of bait was not captured by his recording device.  [Id. at 92]. Accordingly,    the    Defendant    asserts    in    this    appeal    that    Webb's

---

[8] Defendant did not object to this testimony at trial. [Doc. 9-1 at 22-23]. Defendant also implies on appeal that he may be raising a hearsay objection regarding this testimony, [Doc. 9 at 12], but this is clearly an admission of a party opponent and thus is not hearsay per Rule 801.

"uncorroborated statement is an insufficient basis for convicting the Defendant[.]"  [Doc. 9 at 15].

The Defendant's contention, so framed, questions the credibility determination made by the Magistrate Judge.  "The problem here is unlike that which arises when the prosecution rests upon indirect or circumstantial evidence and the contention is made that the evidence does not fairly justify an inference of guilt." United States v. Shipp, 409 F.2d 33, 36 (4th Cir. 1960). In the proceedings below, Magistrate Judge Howell heard Webb's testimony which, if believed, plainly furnished a sufficient ground for finding guilt beyond a reasonable doubt.  "We have repeatedly stated that the triers of fact are to determine credibility."  Id. (footnote omitted).  Further, the trial judge, unlike a jury, is vested with broader power.  "Even when there has been substantial evidence which required him to submit the case to the jury, he may in his discretion set the verdict aside and grant a new trial if he thinks the verdict is against the weight of the evidence, and it is his duty to do so if he is convinced that permitting the verdict to stand would result in a miscarriage of justice."  Id. at 36-37.  The Magistrate Judge credited Webb's testimony. Given the Magistrate Judge's opportunity to hear and observe the witnesses at trial, and given the evidence as a whole presented by the Government to substantiate the Defendant's guilt, the Court will not disturb the Magistrate

Judge's credibility determinations. For these reasons the Defendant's third argument regarding the Magistrate Judge's evidentiary decisions is overruled.

IV.    The Assertion of the Right to Trial by Jury.

The Defendant contends, in his final argument, that the Magistrate Judge committed reversible error by denying him a trial by jury on each of the two counts alleged against him in the Information.  The Defendant concedes, however, that binding precedent exists directly contrary to his position:

> While the United States Supreme Court in Lewis v. United States 518 U.S. 322, 116 S. Ct. 2163, 135 L.Ed.2d 590 (1996) held that a right to a jury trial for multiple petty offenses under a single indictment does not give rise to a Constitutional protection for a trial by jury, the Defendant maintains that this is an improper reading of Article VI and therefore asserts his Constitutional right to a jury trial under the plain language of the Constitutional Amendment seeking a review of the Supreme Court of its decision.

[Doc. 9 at 16].  While acknowledging that the Defendant has preserved this issue for further review, this Court is duty-bound to follow the Supreme Court's precedent in Lewis and overrule the Defendant's argument on this final issue.

**ORDER**

**IT IS, THEREFORE, ORDERED** that Appellant David Frank Crisp's conviction on Count Seven of the Information is hereby **AFFIRMED.**

**IT IS SO ORDERED**.

Signed: November 17, 2015

Martin Reidinger
United States District Judge